Page number 13348, EEOC v. Kaplan Higher Education Corporation at 4RHC 1525, Mr. Milford, 4ZNL Page number 14349, Ms. Gray, 4ZNL You may proceed. Good morning. Good morning. May it please the Court, my name is Kate Northrop and I represent the United States Equal Employment Opportunity Commission. In this case, the district court abused its discretion when it threw out the expert's disparate impact analysis, not because the court found flaw with the analysis itself, but because the court believed that the factual basis, or more particularly part of the factual basis, was weak. In 2006, Kaplan... That's a good reason for excluding stuff, if accurate. The court's belief that the data was weak was clearly erroneous, as we've discussed in our brief. But this court has often analyzed Daubert exclusions and held that there is a line when considering the sufficiency of the data over which the district court as gatekeeper should not cross. And here... Let me ask you a question. Is the court allowed to apply the Daubert factors? Is it your contention that the court should have applied none of them in this case? It is not our contention that Daubert obviously applies and the district court has discretion to determine how best, which tools within the Daubert case should be used to assess the evidence. But in assessing them, they were misapplied. And the court rejected all other evidence, which Kumho acknowledges there are other ways to prove reliability. The district court credited none of the other evidence that we showed. The anecdotal corroboration of expert testimony? Is that what you're referring to? The expert did not call it anecdotal corroboration. That was a phrase that was used in one of the briefs in a footnote. But the expert said... One of the government's briefs? In a footnote in one of the government's briefs. What the expert said, and it is undisputed what the expert said, is that when he was analyzing and looking at the consistency with which the panelists looked at these photos, which made up only part of the race identifications, he compared those observations to race self-identification that he had for the same persons in all 57 cases where he had both, and that he found a very high rate of consistency, 95.7% when compared with DMV data and 80% when compared with Kaplan's own higher data reflecting self IDs. And the expert's undisputed testimony was that was part of the reason and part of the way he determined that this was reliable. Counsel, what's the standard of review that we must use as it relates to the expert and the district court? What's our standard of review? The standard of review is abuse of discretion. But here the court erred in two ways that constituted, two major ways that constituted an abuse of discretion. One was in a clearly erroneous assessment of the evidence, that is, crediting none of the evidence that the government showed that tended to show that these photographs, the observations, were reliable and had hallmarks of reliability, and finding and misapplying instead specific enumerated Daubert factors and finding we didn't satisfy any. We did satisfy at least three and perhaps four of the enumerated factors. But when the court applied those factors, it misapplied them and erroneously assessed the evidence. And that does constitute an abuse of discretion. As this court has said, where the court finds that it is firmly convinced that a mistake has been made, that constitutes an abuse of discretion. Which three Daubert factors do you think you met here? In this case, the government met at least, well, first of all, the district court assumed we met testability. That is assumed in the opinion, so I won't address that. Well, I'm not so sure about that. Let's just dispense with assumptions. And you tell me which ones you think are met and why. We believe we met testability. Why? How so? The 57, you know, anecdotal or corroboration? Is that what shows testability? Well, testability, first of all, is not necessarily that it was tested using the best method available. Yeah, I mean, the factor actually is tested. It is tested or testable. Okay. And so how was that met here? In this case, the expert tested in all 57 cases where he had two sources that there was a high degree of consistency. And he said that constituted a low error rate and that evidence is undisputed. So the 57 is what supports the tested in your view? It supports the tested. Also, the high degree of inter-rater agreement. That is, among the five panelists, as to a very high number of the photos, they reached 75% of the photos. They reached 100% agreement. And keep in mind, they were using five categories. So the expert used a method. Was that not a very small sample, though, that the proof offered to the court with respect to the consistency among those raters? I thought that was a very small sample. No, it was in all of the cases where photographs were looked at by the panelists. Yes. There were 891 photographs looked at. As to 75% of those photographs, there was perfect agreement. As to 88% of those photographs, which was 788 of them, four out of five persons agreed of the panelists. So the inter-rater agreement covers every single photo that they observed. The 57 cases, I think Your Honor is talking about the 57 cases, that is also all of the instances where we had both sources of identification for the same people. So what's the next factor? The next factor, Your Honor, is we satisfied showing the existence and maintenance of standards and controls. The expert, as I said, chose five persons who had a median of 24 years of experience. Sometimes he was one of the persons. In only 15 photos did he and his staff look at them and produce a race identification from the photograph in only 15 of the 891 cases. Sometimes the raters were given surnames, sometimes not, I gather. No. Well, no. They were given some. Every photograph that was given to the panelists had the name of the person depicted in the photograph on the photograph in some way. There were none that did not have the name. The panelists were not instructed to use the names. There is no evidence that they did, and there is no evidence that any person was, in fact, identified by last name. Well, wait a minute. To the extent that is a factor that introduces some sort of bias or inaccuracy, it's your burden to present evidence that it wasn't used. It's not their burden to show that it was used. Isn't that fair as the proponent of expert testimony? It's fair to show that it is our burden to show that the process was reliable. However, the supposition that it may have created an undetended bias is a supposition. And in the context of the gatekeeping analysis, because the discretion is so great with the trial court, it is important where the trial court passes that line and credits purely supposition or purely hypothetical challenges to enforce that limitation. The discretion is not unfettered. Here, and we did show that the names were on the photographs. There is not a single person, however, who there is any evidence that person was actually identified using the last name. Why was the name given to them then? The name was put on the photos really as a housekeeping administrative matter to make sure that they were all, the expert could be sure that each person who was depicted in the photo was in fact the person whose record was delivered by the Department of Motor Vehicles because some of the photos were delivered with the name in the file, the electronic file name by the Department of Motor Vehicles. So when the photo was printed out, the name did not appear. So the expert made sure that they were each properly identified. So as a factual matter, you're saying that every single photograph that these people rated had a name? Everyone had a name. That's true. What's the third factor? The third factor that we showed besides evidence of standards and controls, so we also presented studies, cited studies, particularly the Lamberth study out of Kansas where there was visual means used to race identify motorists. The transient motorist data in that case was not accepted because of the difficulty of identifying persons as they drive by, but the portion of the benchmark that was obtained by stop data where persons were still, they were not in motion, and they were observed in their vehicles was accepted. We cited that, and the district court acknowledged in her order that both parties cited studies where visual identification has been used. And in those studies, although some of the studies did point out people may encounter difficulties under certain circumstances, inter-rater reliability, multiple people looking at the same exact image or person, was proposed as a means of resolving those difficulties. So we also showed studies. Now, are they traditional peer review in the sense that the actual data that was compiled here was published and reviewed? No. But our position is that this kind of function of looking at people and being able to discern, generally speaking, whether they are black or white, is so commonly accepted, we do it every day, witnesses certainly do it every day, that using peer review... We don't tell employers not to do it. Isn't that true? Actually, we don't tell employers not to do it. We tell employers to seek self-ID first. And then if they do not have self-ID from their employees, to use visual identification. And that's exactly what we did here. In fact, at the end of the day, after all of the data came in, out of the 1,880 persons who were race-identified in the applicant pool here, 1,188 of them, almost 60%, were identified using self-identification. Not the panelists and not the photographs. So we also provided these studies to round out our presentation on the enumerated Dawbert factors. I'd like to reserve some additional time. Thank you. Thank you. Good morning. May it please the Court, my name is Gerald Matman of Cypher-Shaw, and I represent the defendants in this case. As Your Honor's questions to the EEOC counsel indicated, at issue here is whether or not the district court abused its discretion with respect to its treatment of the EEOC's expert report. I think there's no dispute that summary judgment rose and fall on the EEOC's expert because it put its entire case or all of its eggs in the basket of trying to demonstrate disparate impact through use of its expert. This case, of course, was over the employer's use of credit checks, and the district court judge indicated this was something the EEOC itself did for 84 of its 77 positions. What the district court found was that the EEOC's expert report had no legs, and it was somewhat of a moving target, and I think the facts of that moving target and the timing of that moving target are important. The facts in the record show that the original report that the EEOC's expert tendered was on May 1, 2012, but then it was supplemented on August 17, 2012, and Judge, you asked about the sample size. Actually, that report analyzed 1,090 applications from a vendor called GIS, which had a base of 44,670 applications. But at the same time, that August 17 report ignored 709 applications from Higher Right, a second vendor, and 1,250 applications in PeopleSoft. Do you know offhand, I mean, what was the total number of applications for the relevant period? I mean, so you've just said this GIS vendor had a total of 4670 apps. Is that all of them, or are there more? We believe the record would show that with all of them, so if the grand total of the universe would be in excess of about 6,000, between 6,000 and 7,000. That's in the record somewhere? Yes, sir. Ten days later, the expert, Dr. Saad, for the defendant, tendered his report. And then on September 5, there was a new report from Dr. Murphy, and the defendants moved to strike it because it was not a rebuttal report. It was our position that it was a new report. The district court judge ruled on that on October 5, and the district court said, I'm going to allow that report, but no more. Entered an order saying that is the end report. Well, Dr. Murphy was deposed on November 8, and by my count, for the fourth time he supplemented his report, published a new report that relied upon an additional 80 applications. Then on December 21, a fifth report where he submitted a report talking about the 57 anecdotal corroborating applications. So you had a series of reports, a moving target, and as your questions pointed out, it was always the burden of the EEOC to demonstrate the reliability under the Daubert standards of the expert report. What's your response to Ms. Northrup's point that three of the Daubert factors here did have some support that the district court overlooked? I guess the testability, the standards of controls, and I think peer review, if I'm not mistaken. Well, I believe what my colleague indicated were conclusions that are not supported by the facts in the record that the district court in her 21-page decision shifted through and point by point selected those issues and analyzed whether or not the EEOC's proof, what it tendered, was sufficient to demonstrate those points. The EEOC quarrels with the district court and says she erred. The brief talks about the errors by the district court, but for the first time in oral argument this morning, the EEOC admits that, well, this is about an abuse of discretion, whether or not in sifting through those factors and analyzing them, the judge was so manifestly incorrect or went so beyond the bounds of what the law requires that that somehow constituted an abuse of discretion. Why don't you think checking the 57 ratings for which Murphy had self-identification data, why isn't that some support for the idea that this could be tested, that his rating methodology could be tested? Because it was done on December 21, months after the October 5 order, when the judge said no more reports, where the defense had pointed out time after time Dr. Murphy's errors. This is not the first time Dr. Murphy has tendered a report to a federal district court and it's been barred. The case of EEOC v. Freeman... The Maryland case. The Maryland case, the court said Dr. Murphy's cascading number of reports make a mockery of the procedural orders that the court has entered. If we set aside the procedural point that it was untimely, and I certainly understand the point you make there, what's your response on the substance of their argument that these 57 show that it was testable? It was not scientific. It wasn't done through a random sample. The EEOC admitted much in its briefs. In response to your question, admitted in a footnote in their brief said it was not a scientific study, it wasn't a random sample, and the size of the sample wouldn't pass muster under Daubert standards either. And so it was a snapshot of something that was in response to a critique of the expert report that came so far down the line, and the district court certainly didn't abuse its discretion in saying the reasons you've now tendered to demonstrate its reliability don't hold weight. The EEOC tends to find fault with the district court in terms of applying Daubert. Should it be one of the four that's important? All the four. This court's decisions in Siegler and Bond say it's up to the district court to look at the facts and circumstances before it and then in a flexible manner apply those Daubert standards. That's precisely what the district court judge did in this particular case. She obviously knew the law. She was adept at the law, had been through the process, went through each of the factors, and found that the report was lacking in reliability. The EEOC could have done many things to prove and demonstrate the reliability of its report. It could have conducted telephone interviews of the people. It could have filed a motion with the court seeking to send a questionnaire to the people where they self-identified themselves. For whatever reason, after four years of an investigation and four years of litigation, the EEOC decided to do it through this rating system with the photographs, something that other courts had said was inherently unreliable. And as they put all their eggs in one basket and their whole case depended upon that expert study that the district court found to be unreliable, it makes sense that the district court judge would basically say there's no way in the world that the EEOC can prove disparate impact and summary judgment ought to be granted. So we think the judge was well within the bounds of the law, applied the correct factors, and she looked at the right factors. The testing of the theory and the peer review, this is something that was very controversial, and this was not something that was accepted in the scientific community. And so when it comes to the issue of abuse of discretion, we believe that the factors that were in front of her were the appropriate factors and there's no abuse that was shown. So thank you for your attention. If there are any other questions? Apparently not. Thank you. Thank you. Thank you, Mr. Milner. Ms. Northrop. Thank you. Briefly to address some of the issues that were raised by Kaplan, the use of telephone interviews, surveys, and face-to-face surveys as an option. The EEOC presented undisputed testimony through its expert that the use of papers, surveys, and questionnaires has an unacceptably low return rate. And through a study that he presented, showed that telephone interviews tend to over-represent whites and that face-to-face interviews as compared to telephone tend to over-represent minorities. Kaplan did not make its record on this point, and it had every opportunity to oppose that evidence. The expert explained that that is why he augmented the self-identification race data. Well, if over-representation of the sort you just mentioned renders data, I guess, unreliable for purposes of drawing conclusions, what are we to make of the over-representation of fail rates in the applications that Dr. Murphy used? This is tied up with Kaplan's focus on procedure because the alleged disparity in fail rate existed only with regard to the original data set of 1090 that was added to once our expert was able to open Kaplan's PeopleSoft data and add the 808 persons Kaplan credit-checked and hired. It went down, but it didn't go away. It went to 15.7%, which is almost the same fail rate in the generalized applicant pool. But doesn't that give one some pause that adding a relatively modest number of applications can swing the fail rate so severely? I mean, that's a big change, isn't it? I mean, that's probably a 40% swing. It doesn't give one pause if one thinks about what data was added. The data that was added were all passes because they were all from Kaplan's hire data set showing people who were credit-checked and hired. But that would seem utterly unreliable as well. Self-identification from Kaplan's data? No, I mean, to the extent you're using just pure pass data, I mean, that would seem, again, to really throw off the overall, I mean, the ratio, the fail ratio of the group that you're using and the fail ratio of applicants generally in comparison. This is an important point. The 4670 persons who were identified in the GIS data who some sort of credit check was done on, our expert testified that he searched for as many outcomes as he could find, pass-fail records, and started there. And he included every single person for whom he found a pass-fail record. Those persons were not immediately derivable from that data set. It had to be compiled using three different sources. There was no universally coded PF database here. He compiled that, and he found all of the persons who could be said to have passed or failed. Gathering that data was as much by chance as everything else. In other words, if the outcomes were derivable from Kaplan's records, he included them. Kaplan has not identified a single person ever whose outcome was known who we left out. And they have not identified a single person whose race we got wrong. There was nobody who they said... And as a matter of fact, a focus upon conclusions, I suggest, is misplaced. The focus is upon reliability. I do think that your brief seriously understates your obligation to show reliability. I mean, your brief almost reads like they're seeking to introduce Saad's testimony. And I think that you need, I mean, your brief, your arguments need to focus on why you showed it's reliable. And after discussing this with your Honor today, I wanted to talk about this issue of sampling because it's haunted the analysis, and it's one of the errors below. It's an independent ground for the district court excluding the testimony as I read her opinion. But it is based on a clearly erroneous assessment that this was a sample of those whose race and outcomes were known. Every single person whose race and outcome data could be found was included in this analysis and was analyzed by our expert. And I only point out that Kaplan has not identified anyone we left out because Kaplan's in the unique position here of being the decision maker. This is not like any other kind of data. This is data that Kaplan had control over at some point. They're the ones who made these decisions. And the fact that they have not found anyone we left out, I think, matters because the context matters. I'm not suggesting we don't have a burden at all. What I'm suggesting is that here we satisfied that burden, and the court rejected it based on an erroneous assessment. Can I ask one quick question? Yes. With regard to the names, just as a factual matter, it is true, correct, that the names were not supposed to be considered. It's not part of this methodology. The expert did not intend for them to use names as the way of doing it. So the names were not to be considered. They're not part of the methodology. Is that correct? It was not correct. The expert did not intend for that to be the methodology. Okay. And there's no evidence that they were used, although obviously in the brief we take the position that that would not be a terrible point of data to use. But, yes, it was not part of his plan to have them identify people based on last name. Okay. Thank you very much. Thanks.